CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

March 27, 2026

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

|  |  |  |
|---|---|---|
| **JOHN ROBERT MARTIN, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 7:24-CV-00088 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHADWICK DOTSON,** | ) | **By: Hon. Robert S. Ballou** |
| | ) | **United States District Judge** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

John Robert Martin, Jr., a Virginia inmate proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2022 convictions in Scott County Circuit Court. The Court of Appeals of Virginia affirmed the convictions, and the Supreme Court of Virginia refused Martin's appeal. The respondent has filed a motion to dismiss, Dkts. 13–15, which I will grant and dismiss Martin's petition.

## I.    Background and Procedural History

In May 2018, a grand jury sitting in Hawkins County, Tennessee indicted Martin for aggravated kidnapping of his wife, Dawn Martin. Dkt. 15-3 at 187. The following month, on June 12, 2018, a Scott County, Virginia grand jury indicted Martin with one count of use of a firearm in commission of murder, in violation of Virginia Code § 18.2-53.1, and one count of first-degree murder, in violation of Virginia Code § 18.2-32, in connection with the shooting death of Nicolas Pierce. *Id*. at 1–2. Martin pled guilty to the Tennessee kidnapping charge related to his wife on February 15, 2019. Dkt. 15-1 at 44. Thereafter, on July 6, 2021, a Scott County jury convicted Martin of first-degree murder and the use of a firearm in commission of a felony. His habeas claim involves the murder and firearm convictions.

A.  Facts

Martin married Dawn in 2002, and they have two children together, Savannah and Sierra. Dkt. 15-2 at 784, 785. In June 2017, Martin and Dawn were living in Tennessee when they separated for several months. Dawn took the children to live in California. *Id*. at 150–51, 786. Dawn returned to Tennessee to finalize their divorce and moved in with Martin, who was aware that she planned to out of their trailer. *Id*. at 788-89. During that time, Martin started to suspect that Dawn was having an affair. *Id*. at 748. To obtain evidence of the affair, Martin placed recording devices in Dawn's truck. *Id*. Upon his review of the recordings, Martin learned that Dawn was having an affair with Nicolas Pierce. *Id*. at 752. Martin also learned that Dawn intended to move in with Pierce. *Id*. at 1220–21.

On the morning of May 3, 2018, Martin picked up Pierce from Dawn's brother's house to take him to the bank to repay money he owed Pierce. *Id*. at 754, 946. On the way to the bank, Martin and Pierce drove over the state line into Virginia. Martin pulled over and he and Pierce walked along a trail on Cameron Church Road, discussing whether they had found a good spot for four-wheeling. *Id*. at 755–56. Martin confronted Pierce about the affair. *Id*. at 757. When Pierce denied the affair, Martin shot him three times mortally wounding him. *Id*. at 757, 1127, 1240. Martin took a picture of Pierce's dead body and then returned to his trailer in Hawkins County, Tennessee. *Id*. at 1240, 1245.

Dawn, who was asleep in Martin's trailer, awoke to Martin holding her at gunpoint. *Id*. at 791. Martin showed Dawn a picture of Pierce's body and told her "look what you made me do." *Id*. at 816. He also zip-tied her hands and feet. *Id*. at 795–96. He told Dawn that after shooting Pierce, he would have to kill her and himself. *Id*. at 802. Eventually, Dawn talked Martin into releasing her. *Id*. at 803. Dawn and Martin went to pick up Dawn's son, Christopher Lane, and

2

his girlfriend, Lael Fairchild. *Id*. at 804. The group went to a restaurant. *Id*. at 805. Dawn went to the bathroom with Fairchild, told her about the shooting, and told her to call the police. *Id*. at 806–807. That afternoon, Dawn's brother met Dawn and Martin at the trailer to pick up some clothes, and Dawn pulled him aside and told him what happened. *Id*. at 859. Fairchild and Dawn's brother contacted law enforcement. *Id*. at 840, 860. Later that day, law enforcement officers from the Hawkins County Sheriff's Department arrested Martin after a standoff and detained him at the Hawkins County jail. *Id*. at 9–10, 830. Officers subsequently located Pierce's body. *Id*. at 891.

### B. Procedural History

#### 1. Pretrial Hearings

On July 29, 2020, the trial court held a hearing to address several pretrial motions, including Martin's motions to suppress and the Commonwealth's motion to present evidence of Martin's prior bad acts. Dkt. 15-1 at 50–68, 79–80. The court heard evidence from Martin's parents and several investigators who conducted interviews with Martin in the week following his arrest.

During that hearing, Detective Chris Holder with the Scott County Sheriff's Department testified that he first tried to interview Martin on May 4, 2018, the morning after his arrest. *Id*. at 10. However, Martin invoked his right to counsel and Holder terminated the interview, although he and Martin briefly continued conversation about Martin's health. *Id*. at 11. Martin signed an advice of rights form. *Id*.; Dkt. 15-1 at 55. Holder returned to the jail sometime in the next few days,[1] requesting the passcode for Martin's phone. Dkt. 15-2 at 12. On May 7, 2018, Holder returned to the jail a third time after Jeff Greer, a Hawkins County detective, informed him that

---

[1] The witnesses could not remember the date of this interview.

Martin wanted to speak with him. *Id*. at 13. Martin spoke to Holder briefly before terminating the interview. *Id*. Martin again signed an advice of rights form. *Id*. On May 8, 2018, Holder again returned to the jail after David LaFollette, another Hawkins County detective, informed him that Martin wanted to speak with him. *Id*. at 15. However, when Holder arrived, Martin stated that there had been a mistake and he only wanted to talk to someone from Hawkins County, not a Scott County investigator. *Id*. at 16. On that day, Holder ran into Martin's parents and spoke with them about Martin. *Id*.

The trial court heard conflicting testimony about Holder's conversation with Martin's parents. Martin's mother, Sophia Martin, testified that Holder "asked us if we would talk to my son and see if he would talk to [Holder]." *Id*. at 130. According to Holder, he only gave Martin's parents his phone number in case Martin wanted to talk. *Id*. at 16. Holder testified that he never agreed to "help [Martin] get out" but that he "probably" said he would "go to the commonwealth attorney and talk to him." *Id*. at 24–25. After the conversation, Sophia spoke to Martin and encouraged him to speak to Holder. *Id*. at 131. Holder testified that at 10:00 p.m. on May 8, Sophia called him and told him that Martin would speak to him if he brought a pack of cigarettes. *Id*. at 17. Sophia testified that Holder contacted her to determine whether Martin would speak to him, and she confirmed that he would. *Id*. at 131, 132.

Martin spoke to Investigator Holder and Investigator Pete Chambers, both with the Scott County Sheriff's Office, on May 9, 2018, and admitted to shooting Pierce. *Id*. at 17, 102; Dkt. 15-1 at 60. During this interview, Martin maintained that the shooting was an accident, which was also the theory he advanced at trial. Dkt. 15-1 at 60; Dkt. 15-3 at 197. Martin signed a third advice of rights form during the May 9, 2018, interview. Dkt. 15-2 at 17–18.

Martin moved to suppress statements he made to investigators after May 4, 2018, because he invoked his right to counsel on that date. Dkt. 15-1 at 49. The trial court's original ruling is not included in the record, but the trial court referenced it at sentencing, stating "[w]e had testimony from the officers who interviewed Mr. Martin at a pretrial suppression hearing, and that issue has been addressed. The Court has ruled on it, and I'm not inclined to change my ruling." Dkt. 15-2 at 1436. A recording of Martin's May 9, 2018, interview was introduced at trial. *Id*. at 934–35.

At the July 29 pretrial hearing on Martin's motions to suppress, the government called Dawn Martin to testify. *Id*. at 149. She refused to discuss the events of May 3, 2018, invoking marital privilege. *Id*. at 151. The trial court reserved ruling on the marital privilege issue and directed further briefing. *Id*. at 163–64. At a second pretrial motions hearing on September 2, 2020, the government again called Dawn to testify. *Id*. at 246. Once again, she invoked her marital privilege. *Id*. The trial court ruled that because the kidnapping and murder formed part of a common scheme, Dawn, as the kidnapping victim, could be compelled to testify. *Id*. at 248. Thereafter, Dawn testified to the events of the kidnapping. Dkt. 249–91.

The government moved to admit evidence of Martin's prior bad acts, specifically, facts about Martin kidnapping Dawn the day of the murder. Dkt. 15-1 at 81. Martin moved to exclude evidence about the kidnapping. *Id*. at 249. The trial court reserved ruling on the admission of prior bad acts at the July 29 hearing. Dkt. 15-2 at 192. Dawn testified again about the kidnapping at a September 2 pretrial hearing. The court held that because the kidnapping and murder were part of the same common scheme or plan evidence regarding the kidnapping was admissible at trial . *Id*. at 299. But, the trial court reserved ruling on the admissibility of the kidnapping conviction pending additional briefing. *Id*. at 302–04.

## 2. Trial Motions and Verdict

Before trial, Martin filed an additional motion to suppress evidence of the kidnapping conviction. Dkt. 15-1 at 254. The trial court reaffirmed that evidence about the kidnapping conviction was admissible during trial, and held that the kidnapping conviction was also admissible. Dkt. 15-2 at 336–337. At the start of trial, Martin requested that the jury be allowed to visit the site of the shooting. *Id*. at 339. The trial court took the motion under advisement. *Id*. at 340. At the close of evidence, the trial court denied the motion to visit the site. *Id*. at 1363–64.

The jury convicted Martin of first-degree murder and the use of a firearm in commission of a felony. Dkt. 15-1 at 334–35, 337. On March 2, 2022, the trial court denied Martin's motion for a new trial and motion to set aside the verdict and sentenced Martin to life plus three years. Dkt. 15-2 at 1432, 1436, 1504.

## 3. Post-Trial Motions

Martin appealed his convictions to the Court of Appeals of Virginia, alleging twelve assignments of error. Dkt. 15-3 at 2–3, 32–35. On April 18, 2023, the appellate court affirmed Martin's conviction in an unpublished opinion. *Id*. at 185–210. Martin filed a petition for a rehearing *en banc*. *Id*. at 211–21. On May 16, 2023, the appellate court denied the petition. *Id*. at 224.

On June 15, 2023, Martin appealed to the Supreme Court of Virginia, alleging five assignments of error also raised before the appellate court:

1. The Court of Appeals of Virginia erred when it ruled that the trial court was not in error by denying Appellant's motion to suppress statements made during police interviews after the Appellant asserted his Fifth Amendment right to counsel and after the detective used Sophia Martin as an agent of the Commonwealth to secure a statement; therefore, his rights under Miranda and its progeny were violated.

6

2. The Court of Appeals of Virginia erred by ruling that evidence of Appellant's bad acts, including a conviction from Tennessee, concerning Dawn Martin were permissible during the guilt phase of the trial and that the admission of the Tennessee kidnapping conviction was harmless; therefore, Appellant's right to a fair trial was violated when the jury was allowed to hear such evidence.

3. The Court of Appeals of Virginia erred by ruling that compelling Dawn Martin to testify against John Martin after invoking her privilege not to testify was harmless error.

4. The Court of Appeals of Virginia erred when it ruled that refusing Martin's request to take the jury to view the sight of the shooting was proper and is reversable error.

5. The Court of Appeals of Virginia erred when it ruled that the Commonwealth presented sufficient evidence of motive and malice to support a conviction for murder; therefore, the charges should have been dismissed against Appellant.

Dkt. 15-4 at 7–8 (internal citations omitted). On November 23, 2023, the Supreme Court of Virginia refused the petition for appeal. *Id*. at 47.

C.  Petition for Habeas Corpus

Martin timely filed a petition for a writ of habeas corpus[2] in this Court on January 31, 2024. Dkt. 1. He alleges four claims for relief:

1. Suppression of statements made during interrogation(s). The trial court decision to admit or exclude evidence is reviewed using an abuse of discretion standard. The erroneous ruling to allow the admission of the interview(s) at trial court and the Court of Appeals/Supreme Court of Virginia's panel upholding that ruling made petitioner a witness against himself and essentially forced petitioner to take the stand at trial to testify on his behalf, therefore, the error is not harmless. For those reasons Petitioner's May 9, 2018 confession, and all of the other interviews subsequent to the May 4, 2018 request for counsel, should have been suppressed.

2. The Court of Appeals erred by ruling that evidence of bad acts, including a conviction were permissible/harmless. It is a fundamental principle of jurisprudence, that evidence which is not relevant, is not admissible. Evidence which has no tendency to prove guilt, but only serves to prejudice an accused, should be excluded on the ground of lack of relevancy, for evidence to be

---

[2] Martin does not include facts or argument in his petition. Therefore, the petition is construed as incorporating his arguments on appeal to the Supreme Court of Virginia. *See* Dkt. 15-4 at 2–40.

7

admissible it must relate and be confined to the matters in issue and tend to prove an offense or be pertinent thereto. Evidence of collateral facts of those incapable of affording any reasonable presumption or inference on matters in issue, because too remove or irrelevant cannot be accepted in evidence.

3.  The Court did not reach the merits of the arguments regarding the compelled testimony of Dawn Martin. Pursuant to Virginia Code § 19.2-271.2 criminal cases wherein persons married to each other shall not be compelled to testify against each other except in the case of a prosecution for an offense committed by one against the other. This language clearly bars the Commonwealth from compelling the testimony of an unwilling spouse for the purpose of inculpating the defendant in a criminal proceeding.

4.  The Court erred when it ruled that refusing petitioner's request to take the jury to view the sight [sic] of the shooting was proper. Petitioner avers that, the physical viewing of the scene would assist the trier of fact in making its own conclusions about the scene and would help it understand the layout, location, and how the factors related to the crimes . . . petitioner explained how the land contour was that of a hill, as most layouts are in southwest Virginia. Petitioner described how he fell backward over his prosthetic leg, as the gun was fired. Photos of the scene was [sic] introduced as evidence. Those photos were not accurate in illustrating the exact dimensions and topography of the physical scene.

*Id*. at 5, 7, 8, 10. Martin requests a new trial based on constitutional violations. *Id*. at 15.

Respondent filed a motion to dismiss. Dkt. 13–15. Martin failed to respond, so his claims are now ripe for review.

## II.    Legal Standard

A federal court "shall entertain an application for a writ of habeas corpus" filed by a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner is generally required to exhaust all state court remedies before filing a habeas petition under § 2254. 28 U.S.C. § 2254(b). A petitioner properly exhausts his state remedies by presenting his claims to the highest state court. *See Baker v. Corcoran*, 220 F. 3d 276, 288 (4th Cir. 2000) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999)). As Martin raised his grounds for relief in direct appeal to the Supreme

Court of Virginia, his claims are properly exhausted, and this Court may address the petition on the merits. *See* Dkt. 15-4.

Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A decision is "contrary to" federal law only if it reaches a legal conclusion that is directly opposite to a Supreme Court decision or if it reaches the opposite result from the Supreme Court on facts that are materially indistinguishable from the facts before the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application" of federal law only if the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The question is not whether a federal court believes the state court's decision was incorrect, but whether the decision was unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

"A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this Court." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *see also Parker v. Matthews*, 567 U.S. 37, 48 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'"). The federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In applying § 2254(d) when the state's

9

highest court has not issued an opinion, the Court must "look through" the "last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *see also Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017). Because the Supreme Court of Virginia refused the petition for appeal, I will address whether the decision of the Court of Appeals of Virginia is contrary to or an unreasonable application of clearly established federal law.

### III.   Discussion

#### A.   Claim 1: *Miranda* Violations

Martin claims that the trial court erred in denying his motion to suppress because law enforcement officers returned four times to interrogate him after he invoked his right to counsel on May 4, 2018. He alleges that the denial violated the Fifth Amendment because it "made petitioner a witness against himself and essentially forced petitioner to take the stand at trial." Dkt. 1 at 5. First, Martin alleges that Holder violated his Fifth Amendment rights by returning to interrogate him three times after he invoked his right to counsel. Dkt. 15-4 at 17. Second, Martin claims that Holder encouraged his mother, Sophia Martin, to convince him to speak to law enforcement without counsel, thereby turning her into a government agent. *Id*. at 16. Martin argues that because Sophia, as an agent of the state, initiated contact after he invoked his right to counsel, any subsequent confession was obtained in violation of his Fifth Amendment rights.

##### 1.  Holder's Repeated Visits

The issue is whether the appellate court's decision that Martin reinitiated contact with Detective Holder was reasonable. The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In

10

*Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court announced a rule requiring law enforcement officers to advise suspects of their right to remain silent and right to have an attorney present before conducting custodial interrogation. The Supreme Court precedent establishes that additional safeguards are appropriate when the suspect has invoked his right to counsel. Specifically "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

An accused initiates contact with law enforcement when he expresses willingness to discuss the subject matter of the investigation, rather than a mere inquiry about the incidents of the custodial relationship. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983). An accused who initiates contact is no longer protected under *Edwards*, and inculpatory statements are admissible if the accused understood and knowingly and intelligently waived his right to counsel. 451 U.S. at 486 n.9. The Government bears the burden of establishing a valid waiver if a statement is taken without the presence of an attorney. *Miranda*, 384 U.S. at 475. However, on federal habeas corpus review, the petitioner bears the burden of proving that he did not validly waive his constitutional rights. *Johnson v. Zerbst*, 304 U.S. 458, 468–69 (1938). Although a valid *Miranda* waiver involves a mixed question of law and fact, the Court must presume that the state court's factual findings as to waiver are correct. *See* 28 U.S.C. § 2254(e)(1).

Applying *Edwards*, the Court of Appeals of Virginia affirmed the trial court's denial of Martin's motion to suppress, finding that Martin's statements were voluntary, holding that "Martin initiated contact with the law enforcement summoning Detective Holder numerous times. Each time, Martin was properly Mirandized." Dkt. 15-3 at 197. The appellate court further

11

reasoned "[d]uring his last communication requesting that Detective Holder travel to Tennessee to speak with him, Martin voluntarily agreed to be interviewed." *Id*. Finally, the appellate court concluded "Martin initiated contact with Detective Holder and voluntarily provided a statement to him which was consistent with the theory he advanced at trial—that he shooting was accidental." *Id*.

Having reviewed the record, I find that the appellate court's decision was not contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts. Martin is correct that, under *Maryland v. Shatzer*, law enforcement officials must provide a two-week break in custody before continuing interrogation after a suspect has requested counsel. 559 U.S. 98, 110–11 (2010). However, this prohibition on continued interrogation does not apply when the suspect reinitiates contact with law enforcement. *Edwards*, 451 U.S. at 484–85. Here, the record reflects that Martin asked to speak with law enforcement on three separate occasions after he invoked the right to counsel. Dkt. 15-2 at 13–17. Martin asked to speak with law enforcement about the case specifically, not the incidents of custody. *See Bradshaw*, 462 U.S. at 1045–46; *see, e.g.* Dkt. 15-2 at 17 ("[Sophia] said that John wanted to tell me the whole story, the whole truth if I would bring a pack of cigarettes and come back down there and try it"). Martin also signed an advice of rights form at each interrogation, suggesting a knowing and intelligent waiver. Dkt. 15-1 at 55, 56, 59. Therefore, the state court conclusion that Martin waived *Edwards* protection by initiating contact with Detective Holder was not unreasonable or a violation of clearly established law. Therefore, Martin's Fifth Amendment claims as to contact with Detective Holder raised in Claim 1 have no merit and must be dismissed.

### 2. *Agency Relationship*

Next, the issue is whether the state court determination that Sophia Martin did not act as a government agent is contrary to or an unreasonable application of established law. The Fifth Amendment protects against governmental coercion. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Therefore, private coercion violates the Fifth Amendment only when the private party acts as an agent of the government. The Supreme Court has not addressed the agency relationship in the Fifth Amendment context. Assuming, *arguendo*, that the standard to determine an agency relationship is the same as in Fourth Amendment cases, the rule in *Skinner v. Railway Labor Executives' Ass'n* controls. *See Andrew v. White*, 604 U.S. 86, 94 (2025) ("General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court").

In *Skinner*, the Supreme Court held that "[w]hether a private party should be deemed an agent or instrument of the Government . . . necessarily turns on the degree of the Government's participation in the private party's activities." 489 U.S. 602, 614 (1989) (assessing the agency relationship in the Fourth Amendment context). The Government must do more than "adopt a passive position toward the underlying private conduct." *Id*. at 615. The inquiry considers "all the circumstances of the case." *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971).

Martin has failed to show that the appellate court's decision was contrary to clearly established law. The Court of Appeals of Virginia identified the Virginia agency test:

> The first prong of that test is "(1) whether the government knew of and acquiesced in the search, and (2) whether the search was conducted for the purpose of furthering the private party's ends." *Sabo v. Commonwealth*, 38 Va. App. 63, 74–75 (2002) 74-75 (quoting *Mills v. Commonwealth*, 14 Va. App. 459, 463–64 (1992)). . . . "Other factors include whether the private party acted at the request of government and whether the government offered a reward." *Id.* (quoting *United States v. Smith*, 27 F. Supp. 2d, 1111, 1115 (C.D. Ill. 1988)).

13

Dkt. 15-3 at 195. Although the Supreme Court held in *Parker* that circuit precedent is not clearly established law, it is notable that the Fourth Circuit has promulgated a near-identical test to define agency in this context. 567 U.S. at 48; *see United States v. Day*, 591 F.3d 679, 683 (4th Cir. 2010) (defining the agency relationship when private parties interrogate an accused). Both tests cite to and rely upon the clearly established Supreme Court law announced in *Skinner* and *Coolidge*, which also focus on the Government's participation in private activities. Because the Court of Appeals of Virginia did not announce a rule contrary to Supreme Court precedent, Martin fails to show that the decision was contrary to clearly established law.

Martin also fails to show that the state courts unreasonably applied clearly established law. Addressing the agency issue, the Court of Appeals of Virginia determined that Detective Holder's contact with Sophia Martin was minimal, and therefore she did not act as an agent of the government. Dkt. 15-3 at 197. In the absence of directly relevant Supreme Court precedent on this issue, the Fourth Circuit and the Virginia courts have considered (1) the government's knowledge of the private party's conduct and (2) the private party's motive for such conduct. *Day*, 591 F.3d at 683; *Sabo v. Commonwealth*, 561 S.E.2d 761, 766 (Va. Ct. App. 2002). This standard aligns with Supreme Court precedent, which requires consideration of the government's participation considering the totality of circumstances in the particular case. *Skinner*, 489 U.S. at 614–15; *Coolidge*, 403 U.S. at 487. Applying this standard, the appellate court relied on the first prong, Holder's knowledge of Sophia's conduct, to find that Sophia did not act as an agent. Further, the appellate court upheld the trial court denial of the motion to suppress because Martin repeatedly initiated contact with Holder and provided a voluntary statement.

Finally, Martin has failed to show that the appellate court's decision was an unreasonable determination of the facts. The appellate court held that "[i]n the light most favorable to the

14

Commonwealth, the evidence reflects that Detective Holder simply advised Martin's mother that he would like to talk to Martin and provided her his phone number." Dkt. 15-3 at 196–97. Martin argues that an agency relationship existed because Holder admitted that he "probably" encouraged the contact, as he agreed to speak with the commonwealth attorney if Martin cooperated. Dkt. 15-2 at 25. The appellate court reasoned that the trial court was "best positioned to resolve conflicts in the testimony of witnesses." Dkt. 15-3 at 196. Thus, finding Holder's testimony more credible, the appellate court analyzed the agency issue considering Holder's version of events.

The state court's factual determination is entitled a presumption of correctness. 28 U.S.C. § 2254(e)(1). Martin has not provided any additional facts, much less clear and convincing evidence, that the state courts unreasonably concluded that Holder had only minimal contact with Sophia. Because Martin has failed to show that the state court agency determination was objectively unreasonable or contrary to federal law, his claims have no merit and must be dismissed.

B.  Claims 2, 3, and 4: Alleged Errors of State Law

The Court cannot grant federal habeas corpus relief on Claims 2, 3, and 4, alleging the Court of Appeals erred in applying the Virginia Rules of Evidence, because federal habeas relief is not available for alleged state law errors unless the petitioner raises a constitutional claim. Dkt. 1 at 7–10. Specifically, Martin argues admitting evidence of bad acts, including the prior conviction for kidnapping (Claim 2), and Dawn's testimony (Claim 3) is reversible error. *Id.* at 7–8. Martin also argues that the trial court erred in denying his motion for the jury to visit the site of the shooting (Claim 4). *Id.* at 10. This Court will not revisit the state court's determination of admissibility of evidence.

15

Although Martin argued on direct appeal that, as to Claim 2, his "right to a fair trial was violated when the jury was allowed to hear such evidence," he did not explicitly raise a constitutional challenge. Dkt. 15-4 at 7. The Court of Appeals of Virginia decided each of these issues on state law grounds. Dkt. 15-3 at 197–203. The federal habeas statute "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). The Supreme Court has "stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Constitutional claims must be raised in the state and federal proceedings and mere similarity of claims raised in state and federal court is insufficient for exhaustion. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 276 (1971). In *Duncan v. Henry*, the Supreme Court unambiguously supplied the standard for review of state law evidentiary rules:

> If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state trial court denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.

513 U.S. 364, 365–66 (1995). Because Martin failed to claim violation of federal law or the Constitution in his direct appeal and in the instant petition, his claims are not cognizable in federal habeas corpus. Therefore, Claims 2, 3, and 4 must be dismissed.

IV.    **Conclusion**

16

For the reasons stated, I will grant the respondent's motion to dismiss and dismiss Martin's petition. Additionally, because Martin has not "made a substantial showing of the denial of a constitutional right," I will deny a certificate of appealability. 28 U.S.C. § 2253(c)(2).

An appropriate Order shall follow.

Entered:  March 27, 2026

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

17